**IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.K.L.R., A MINOR | : | No. 5 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: K.H. | : | Superior Court entered November |
| | : | 13, 2020 at No. 440 WDA 2020, |
| | : | reversing the Order of the Court of |
| | : | Common Pleas of Westmoreland |
| | : | County entered February 6, 2019 at |
| | : | No. 34 of 2019, and remanding. |
| | : | |
| | : | ARGUED: May 19, 2021 |
| | | |
| IN THE INTEREST OF: L.M.J.R., A MINOR | : | No. 6 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: K.H. | : | Superior Court entered November |
| | : | 13, 2020 at No. 441 WDA 2020, |
| | : | reversing the Order of the Court of |
| | : | Common Pleas of Westmoreland |
| | : | County entered February 6, 2019 at |
| | : | No. 35 of 2019, and remanding. |
| | : | |
| | : | ARGUED: May 19, 2021 |

## OPINION

**CHIEF JUSTICE BAER**            **DECIDED: AUGUST 17, 2021**

The trial court in the instant matter denied a county agency's petitions to terminate involuntarily the parental rights of a mother. The agency appealed to the Superior Court, which reversed the trial court's order and effectively terminated the mother's parental rights to two of her children. We granted the mother's petitions for allowance of appeal to consider two issues: (1) whether the Superior Court's decision conflicts with this

Court's opinion in *In re R.J.T.*, 9 A.3d 1179 (Pa. 2010); and (2) whether the Superior Court erred by substituting its judgment for that of the trial court. We respectfully decide both issues in the mother's favor, vacate the Superior Court's judgment, and reinstate the trial court's order.

## I. Background summary.[1]

K.H. ("Mother") and P.R. ("Father") are the parents of S.K.L.R. ("Daughter"), born on September 22, 2014, and L.M.J.R. ("Son"), born on December 30, 2015.[2] On July 18, 2017, Mother had her third child, B.H. ("Younger Son"), with a man we will refer to as T.H. In September of 2017, the Westmoreland County Children's Bureau ("Agency") offered services to Mother and T.H. after it received reports that Mother was overwhelmed with caring for her three young children, that she was rough with the children when disciplining them, and that she struggled with appropriate parenting skills. In addition, Mother had a history of mental health issues.

On December 5, 2017, the Agency received a referral from the Children's Hospital of Pittsburgh regarding Younger Son. At the hospital, doctors performed a CT scan and an MRI on Younger Son to determine why he had an increased head circumference. These tests revealed that Younger Son had subdural hematomas on both sides of his head. Mother had no explanation for these injuries, and hospital personnel were concerned that the hematomas were the result of abuse.

---

[1] We glean our summary of these circumstances from the trial court's thorough opinion docketed on February 10, 2020, as the parties do not contest this portion of the court's opinion.

[2] When appropriate, we will refer to Son and Daughter collectively as the "Children." Although Mother has other children, Son and Daughter are the only children directly impacted by the lower courts' decisions. Further, while the Superior Court's disposition of these matters resulted in the termination of Father's parental rights, he is not a party to this appeal. Accordingly, we will not provide a robust summary of the facts or issues that are solely relevant to Father.

On December 7, 2017, the Agency assumed emergency custody of all three children. The Agency then filed a petition for dependency on December 18, 2017. Therein, the Agency shared Children's Hospital's referral and alleged that the children lacked proper parental care and control. The Agency also noted that it was involved with the older children from 2015 to 2017 due to parenting concerns and issues regarding domestic violence between Mother and T.H., who had been charged with one count each of simple assault and harassment for his alleged abuse of Mother. The petition for dependency further alleged as follows: (1) T.H. was incarcerated at SCI-Fayette on November 27, 2017; (2) Father was incarcerated at SCI-Camp Hill on multiple convictions; (3) on December 13, 2017, the landlord for Mother and T.H. posted an eviction notice at their residence, causing concerns for possible homelessness; and (4) Mother had ongoing mental health problems and previously was diagnosed with anxiety, depression, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder.

On January 19, 2018, a hearing officer held an adjudication and dispositional hearing. That day, the children were adjudicated dependent and remained in the Agency's custody with continued placement in their kinship foster homes.[3] Important to the instant appeal, Mother was charged with the following laundry list of goals: (1) to continue with mental health treatment, individual counseling, and her prescribed medication; (2) to participate in nurturing parenting instruction; (3) to partake in life skills services; (4) to engage in anger management counseling; (5) to obtain and maintain appropriate and stable housing; and (6) to secure and maintain employment.

---

[3] Specifically, the Children were placed and remain with Mother's aunt. We further observe that, according to the Agency, it utilized concurrent planning to aid in achieving permanency for the Children. Agency's Brief at 14. We discuss this concept *infra*.

A permanency review hearing occurred on July 27, 2018. The hearing officer concluded that Mother complied moderately with the permanency plan. For example, although Mother "had maintained housing and employment, she did not regularly attend anger management classes, individual counseling, or parenting classes." Trial Court Opinion, 2/10/2020, at 9. Further, it was reported that Mother gave birth to her fourth child, W. ("Younger Daughter"), on July 16, 2018. Mother's goals remained the same.

The next permanency review hearing was held on January 2, 2019. At that hearing, Mother was found to have complied substantially with the permanency plan and made moderate progress. Regarding this assessment, the trial court observed, *inter alia*, that, on the one hand, Mother was unemployed and continued to get agitated easily at the Children during visits, but that, on the other hand, she maintained housing, cooperated with services, and made advances in utilizing skills that she had been taught. At the conclusion of this hearing, Mother was directed to continue with her original goals; however, because T.H. moved back in with Mother and abuse continued to be a concern, Mother was given the additional goals of addressing domestic violence issues and participating in couples counseling.

On April 12, 2019, Mother signed a consent to adopt form, agreeing to terminate voluntarily her parental rights as to Son and Daughter. However, at a June 26, 2019, hearing, she informed the trial court that she wanted to revoke her consent. The court eventually granted her request in an order dated December 20, 2019.

Another permanency review hearing occurred on July 22, 2019. Mother did not attend, as she did not want to jeopardize her new job. However, her counsel was present. Mother was found to have complied moderately with the permanency plan but to have made minimal progress overall. For example, while Mother found employment, the Agency was informed that she was using cocaine, which resulted in her need to be tested

for drugs. In addition, she attended few mental health therapy sessions but successfully completed anger management classes and her nurturing parent curriculum. Mother essentially was directed to continue to work toward achieving her original goals, save for the ones that she already had met.

**II. Petitions for termination of parental rights and subsequent hearing.**

On March 28, 2019, the Agency filed petitions to terminate Mother's parental rights as to Son and Daughter. In those petitions, the Agency contended that termination was proper pursuant to Subsections 2511(a)(5), 2511(a)(8), and 2511(b) of the Adoption Act. These statutory provisions provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not

be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

On January 16, 2020, the trial court held a hearing on the petitions. At that hearing, the Agency presented testimony from the following witnesses: Kelsey Oddis, a family resource specialist with Justice Works; Amy Kowalewski, a supervisor of the resource specialists at Justice Works; Taylor Patton, a mental health and drug and alcohol counselor from Southwestern Pennsylvania Human Services ("SPHS"); and Tara Lorenzo-Hendershot, an Agency caseworker.

Ms. Oddis testified that, in November of 2019, in her role at Justice Works, she began to supervise visits that the Children had with Mother.[4] N.T., 1/16/2020, at 10. At that time, Mother and the Children met twice per month for a two-hour period. According to Ms. Oddis, since the July 22, 2019, permanency hearing, 12 of 15 scheduled supervised visitations occurred; the three that did not come to fruition were due to Mother failing to confirm visits within 24 hours of when the visits were to occur. *Id.* at 10-11. Ms. Oddis shared that, for purposes of her agency, Mother's goals were to develop skills to ensure the safety, well-being, and permanence of all of her children. *Id.* at 12. Ms. Oddis stated that those goals remained ongoing. *Id.* at 13.

As to her observations of the interactions among the Children and Mother, Ms. Oddis testified that, when the Children arrived at Mother's residence, they usually kissed and hugged Mother, and Mother would ask the Children if they had eaten. Mother would then make them dinner, eat with them, and set up a movie to watch. *Id.* Ms. Oddis

---

[4] Later in her testimony, Ms. Oddis revealed that she supervised only three of the families' visits. N.T., 1/16/2020, at 17.

reported that, when Mother began a movie, the Children either would watch it or play. *Id.* at 16. Ms. Oddis testified that Mother would either watch the movie with the Children, "be on her phone," or engage with them on the floor. *Id.* at 16-17.

Ms. Oddis stated that, when the Children misbehaved, Mother asked them to apologize to one another or encouraged them to incorporate sharing into their play. *Id.* at 18. Ms. Oddis also stated that Mother generally did not yell at the Children, save for perhaps asking them to calm down to watch television. *Id.* at 18-19. Ms. Oddis specifically testified that Mother always used appropriate rules and boundaries, and that she never witnessed Mother do anything that concerned her with respect to the Children. *Id.* at 19. Lastly, Ms. Oddis explained that, when the visits came to an end, the Children hugged and kissed Mother; Son usually had no behavioral issues; but Daughter had temper tantrums when leaving the home and being placed into her car seat. *Id.* at 19-20.

Ms. Kowalewski was the next witness to testify for the Agency.[5] Ms. Kowalewski stated that her agency, Justice Works, provided the family with "Just Care" level of services, which was involved in the supervision of visits and providing nurturing parenting instruction. *Id.* at 25-26. Justice Works constructed this program based upon Mother's performance on family and parenting tests; Mother tested anywhere from above average to below average on those tests. *Id.* at 27-28. Mother was compliant with these services, completing the nurturing parent curriculum in February of 2019. *Id.* at 28.

Ms. Kowalewski reported that Mother struggled to apply the skills that she had been taught to actual parenting scenarios; she highlighted that Mother "would play on her phone and not interact with the children as much as would have been liked." *Id.* at 29. Ms. Kowalewski, however, observed that Mother had successfully corrected problems

---

[5] Throughout her testimony, Ms. Kowalewski confirmed aspects of Ms. Oddis' testimony. We will not reiterate these portions of Ms. Oddis' testimony.

with failing to confirm visitation with the Children 24 hours in advance. *Id.* at 29-30. In terms of Mother's ability to discipline the Children, Ms. Kowalewski stated that: Mother sometimes put the Children on time out; at times, the Children oblige; but the supervising specialist intervened on occasion. *Id.* at 32-33.

According to Ms. Kowalewski, Mother became more compliant with services over time, both in terms of confirming visitation and disciplining the Children, though she stated her belief that Mother remained unable to parent effectively both Son and Daughter at the same time. *Id.* at 34-36. Significantly, on cross-examination, Ms. Kowalewski conceded that she personally observed the family only once when she filled in for Ms. Oddis in December of 2019. *Id.* at 36-37.

The Agency followed up with testimony from Taylor Patton, a mental health and drug and alcohol counselor at SPHS. Notably, Mother was a client at SPHS but not one of Ms. Patton's clients. *Id.* at 40-41. Nonetheless, Ms. Patton testified that, at SPHS, Mother was diagnosed with bipolar I disorder, major depressive disorder, unspecified personality disorder, and adjustment disorder. *Id.* at 42. According to Ms. Patton, on September 7, 2018, Mother entered into a treatment agreement for one session of out-patient therapy per week. Ms. Patton reported that Mother generally complied with this arrangement insomuch as she attended 11 of 30 sessions; however, she ultimately was discharged in June of 2019 for her failure to participate more fully in her treatment. *Id.* at 42-43.

On cross-examination, Ms. Patton confirmed that Mother's testing suggested that she needed mental health treatment, but not drug and alcohol treatment. *Id.* at 44. When Mother's counsel asked Ms. Patton whether she was aware that Mother's treatment attendance issues began when she moved out of the area, Ms. Patton stated that she could not answer that question because she was not Mother's counsel and was basing

her testimony solely on a letter drafted by Mother's actual counselor - a letter that merely summarized the counselor's recommendations and Mother's treatment attendance.[6]  *Id.*

The Agency's final witness was its caseworker, Tara Lorenzo-Hendershot, who was assigned to the family's case in October of 2018.[7]  Ms. Lorenzo-Hendershot began by describing the circumstances that led to the Children being placed in the Agency's custody, as detailed *supra*.  *Id.* at 46-47.  Ms. Lorenzo-Hendershot reported that, at the time of the termination hearing, the Children had been in care for 25 months.  *Id.* at 47.  Next, Ms. Lorenzo-Hendershot recounted Mother's goals, the results of her initial evaluations and recommendations, as well as Mother's participation, or lack thereof, in the suggested services, including visitation with the Children.  *Id.* at 47-58.

Notably, Ms. Lorenzo-Hendershot personally observed Mother visit with the Children on only two occasions:  December 10, 2018, and February 26, 2019.  *Id.* at 58-64.  Ms. Lorenzo-Hendershot testified, *inter alia*, that during her visits, Mother asked for less-restrictive visitation, but Ms. Lorenzo-Hendershot stated her belief that Mother was not ready for this step due to numerous concerns, including Mother's ongoing anger issues and her lack of interaction with the Children.  *Id.* at 61-65.  According to Ms. Lorenzo-Hendershot, she informed Mother in November of 2019, that the Agency would be reducing her visitation from four times per month to two times per month because "typically when the Agency file[s] for termination of parental rights, it decreases visitation between a parent and child."  *Id.* at 66.  Ms. Lorenzo-Hendershot acknowledged that this prospect upset Mother.  *Id.*

---

[6] None of the parties objected to Ms. Patton's testimony on any grounds, including hearsay or competency.

[7] As compared to the Agency's other witnesses, Ms. Lorenzo-Hendershot's testimony was extensive.  For present purposes, we will provide only a brief overview of her testimony and supplement that summary as needed later in the opinion.

At that point, counsel for the Agency began to question Ms. Lorenzo-Hendershot about the details of Mother's current situation. For example, counsel elicited testimony that: (1) Mother then currently lived with her grandmother in a home that may not have accommodated all of its current residents as well as the Children, *id.* at 66-67; (2) Mother had an unstable employment history, though she then was currently employed, *id.* at 67; and (3) Mother was tested 26 times for cocaine, and although she tested positive twice, the screening ceased because she "consistently tested negative," *id.* at 68-69.

After Ms. Lorenzo-Hendershot explained Father's circumstances relative to the petitions to terminate his parental rights to the Children, *id.* at 69-76, she explained why she believed that termination of Mother's parental rights was justified pursuant to 23 Pa.C.S. § 2511(a)(5). In this regard, she testified that: (1) the Children had been out of Mother's custody for at least six months; (2) the conditions that led to the Children's removal, *i.e.*, Mother's mental health issues, continue to exist; and (3) the conditions that led to the Children's removal will not be remedied within a reasonable amount of time in the future because "[g]iven the length of time that the children have been in Agency custody and given the services provided to mother, it is unlikely that mother will remedy the conditions within a reasonable time period in the future." *Id.* at 78-79.

When counsel asked whether Ms. Lorenzo-Hendershot believed that termination would best serve the needs and welfare of the Children, she responded in the affirmative. *Id.* at 80. In support of this opinion, Ms. Lorenzo-Hendershot explained that Mother has not demonstrated that she is able to reunify with the Children despite being offered numerous services and that the Children's needs are being met by their kinship foster mother with whom they have an appropriate bond. *Id.*

Ms. Lorenzo-Hendershot then explained why she believed that termination was proper pursuant to 23 Pa.C.S. § 2511(a)(8): (1) the Children had been in agency custody

for over 12 months; (2) the conditions that led to their removal continued to exist; and (3) for the reasons previously stated, termination would best serve the Children's needs and welfare. *Id.* at 81. Along these same lines, Ms. Lorenzo-Hendershot testified that termination of Mother's rights would meet the requirements of 23 Pa.C.S. § 2511(b). *Id.* She also stated her belief that, if the court terminated Mother's parental rights, it would not be cutting off a necessary and beneficial relationship for the Children. *Id.* at 84.

On cross-examination, Ms. Lorenzo-Hendershot verified that Mother completed anger management training and her nurturing parenting curriculum. *Id.* at 86. She also stated that Mother has been employed and earning an income. *Id.* Ms. Lorenzo-Hendershot shared that Mother, at times, had made progress, but she reported that the Agency had concerns about Mother allowing T.H. back into the home. Ms. Lorenzo-Hendershot then acknowledged that T.H. no longer had any involvement with Mother. *Id.* at 90-91. Ms. Lorenzo-Hendershot further reported that Younger Daughter was doing well with Mother and that the Agency had no concerns for that child. *Id.* at 92-93.

Mother testified in an attempt to rebut the Agency's position. She explained that she works for a temporary employment company and that she was placed in a full time position with some mandatory overtime. *Id.* at 129. Her current position is "temp to hire," and she is hoping that she will transition out of the temporary nature of the job. *Id.* at 129. Mother also provided a detailed description of her visits with the Children. *Id.* at 131-38. According to Mother, the Children are excited to see her when they arrive, and she engages in activities with them. *Id.* at 131-32. Mother suggested that the alleged excessive time she spends on her phone is due to her taking pictures of the Children throughout their visits. *Id.* at 133.

Mother reported that, when it was time for the Children to return to their foster home, they shared their desire to stay with her. *Id.* at 136. Daughter had a particularly

difficult time leaving Mother; she screamed, cried, and refused to get into her car seat. *Id.* at 136-37. According to Mother, despite her pleas, the caseworkers did not document these difficulties. *Id.* at 138.

Concerning her mental health treatment, Mother testified that she began treatment but had to stop when she moved away from T.H. to live with her grandmother. *Id.* at 139. She reported other difficulties with getting treatment. For example, work limited her ability to see a therapist, and she lost her medical benefits for a time period. *Id.* at 139-40. Mother reported that she only stopped taking her mental health medications when she was pregnant with Younger Daughter and that she had been taking over-the-counter "stress gummies" regularly. *Id.* at 141.

Mother described her typical workday, claiming that she leaves her home around 5:00 a.m., drops off Younger Daughter at daycare, and then works until 3:15. *Id.* at 140. She does not return home with Younger Daughter until 5:00 p.m. *Id.* at 141. When asked whether she would like to be reunified with the Children, Mother answered in the affirmative. *Id.* at 142. She also shared her concerns with the Children's current placement with their kinship foster mother, such as the foster mother not cooking for them. *Id.* at 143. Mother feels that her recent progress has gone unnoticed by the Agency. She recounted that she: has no involvement with T.H.; now has a car and is employed; and is working toward moving into her own housing. *Id.* at 143-44. Mother noted that, if the Children returned to her care, they could go to the same daycare as Younger Daughter. *Id.* at 144.

### III.  Trial court order and opinion.

On February 10, 2020, the trial court entered an order denying the termination petitions. The court authored an opinion in support of its decision. Therein, the court provided a lengthy summary of the background of the cases and of the evidence

submitted by the parties at the January 16, 2020, termination hearing. Trial Court Opinion, 2/10/2020, at 1-23. The court then provided its reasons for denying the Agency's petitions.

The trial court acknowledged that the Children had been removed from Mother for over six months but noted that many of the conditions that led to their removal no longer exist. *Id.* at 23. In this regard, the court found it significant that Mother severed her abusive relationship with T.H. The court observed that, since the Children were removed from Mother's care, she has: (1) participated in mental health treatment; (2) completed parenting instruction; (3) lived with her mother, grandmother, and Younger Daughter while beginning to search for independent housing; (4) secured gainful employment; (5) gained insight into how to parent her children; and (5) demonstrated that she has been able to incorporate some of the skills she has learned during visitation with the Children, *e.g.*, she cooked for them, appropriately disciplined the Children, and played with them. *Id.* at 23-24. The trial court also was encouraged by the Children's affection toward Mother. *Id.* at 24.

The trial court then stated, "Of considerable note in this case is that Mother gave birth to her fourth and youngest child, who is now one and one-half years old, and there have been no concerns about Mother's capacity to parent this child." *Id.* Along these lines, the court highlighted that, at the termination hearing, the Agency caseworker stated unequivocally that they have no concerns for this child. *Id.* According to the court, "[b]ut for the fact that Mother has not attended therapy sessions recently with a mental health professional because her work schedule allows her little time, none of the conditions that led to the removal and placement of the children continue to exist. If they did, we believe Mother's youngest child would not be in her custody either." *Id.*

Next, the trial court concluded that the Agency failed to prove that termination of parental rights would best serve the needs and welfare of the Children. The court recounted that the Children were excited upon seeing Mother, running up to her to give her hugs and kisses. *Id.* at 24-25. The court further observed that the Children did not want to leave at the end of their visits with Mother, causing Daughter to scream and cry. The court opined that, "[b]ased upon this evidence, coupled with the continuing efforts and progress made by Mother to strengthen her relationship with her Children, we find that a bond exists between Mother and her Children." *Id.* at 25. The court acknowledged the caseworker's testimony that the Children are "flourishing" in their foster home. However, the court asserted that it had "little to no evidence to determine whether the developmental, physical and emotional needs and welfare of the Children would be served by severing their relationship with their Mother." *Id.* Indeed, the court ultimately determined that the Children would be harmed if their relationships with Mother were terminated. *Id.*

As we discuss in more detail *infra*, the trial court recognized that the Agency appears to have cast aside the core concept of concurrent planning. In this regard, the court stated, "We are disturbed by the fact that Mother's visitation time with the Children was reduced by the Agency in November 2019." *Id.* at 26. The court observed that the Agency cut in half Mother's physical contact with the Children, citing as justification its decision to pursue the termination of Mother's parental rights. "In other words," the court opined, "when the Agency decided it would pursue termination, it also presumed that termination would be granted and began to withdraw services aimed toward reunification of the family unit." *Id.* The court reminded the Agency that, until a court determines that termination is in a child's best interests, the Agency should continue to aim to reunify the child with his or her family. *Id.*

The trial court ultimately concluded that the Agency failed to present sufficient evidence to meet its burden of proving by clear and convincing evidence that termination was appropriate pursuant to 23 Pa.C.S. § 2511(a)(5), (a)(8), or (b). The court bolstered this conclusion by suggesting that, given reasonable time and services, Mother can remedy her need for mental health services. *Id.* at 27. The court noted Mother's improvement, going so far as to propose that, "with a few more months of steady progress, Mother may avoid losing parental rights to her Children permanently." *Id.* at 28. The Agency appealed to the Superior Court, which reversed the trial court's order and remanded the matter with instructions to terminate Mother's parental rights. *Interest of: S.K.L.R.*, 242 A.3d 415 (Pa. Super. 2020) (unpublished memorandum) ("Memorandum").

## IV. Superior Court Memorandum.

The Agency raised six issues on appeal. Relevant to the current appeal, the Agency argued that it presented sufficient evidence to meet its substantial burden of proof for termination of Mother's parental rights to the Children pursuant to all of the above-mentioned statutory provisions. The Superior Court began its substantive analysis of this claim by addressing the requirements of 23 P.S. § 2511(a)(8). Memorandum at 18-19. The court then concluded that the trial court abused its discretion by finding that the Agency failed to present sufficient evidence to meet the elements of this subsection. *Id.* at 19.

In support of this conclusion, the Superior Court stressed that the Children had been removed from parental care for a period exceeding 12 months and that the reasons for their removal continue to exist. Citing to its decision in *In re A.L.D.*, 797 A.2d 326, 338 (Pa. Super. 2002), the Superior Court insisted that the trial court "erred to the extent that it sought to invoke the fact that Mother maintains custody of her youngest child as a basis to forego the termination of her parental rights to [the Children]." Memorandum at 19.

According to the intermediate court, "[i]t is beyond peradventure that evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." *Id.* (internal quotation marks and citation omitted).

Next, the Superior Court concluded that, through the testimony of Ms. Lorenzo-Hendershot (the Agency caseworker), the Agency demonstrated that the conditions which led to the Children's removal, which the court identified as Mother's mental health problems, still exist. *Id.* at 20. In this regard, the court highlighted Ms. Lorenzo-Hendershot's testimony that, *inter alia*, Mother had not adequately addressed her mental health issues, as she was discharged unsuccessfully from services on June 6, 2019. The court further noted Ms. Lorenzo-Hendershot's concerns with Mother's ability to parent successfully. *Id.* at 20-21. In addition, the court emphasized termination hearing testimony which suggested that, rather than engaging with the Children on their visits, Mother played a movie and occupied herself on her phone. *Id.* at 21.

The Superior Court found it to be important that the trial court acknowledged that Mother had not adequately remedied the conditions that lead to the Children's removal. In this vein, the Superior Court stated its belief that the trial court merely speculated that Mother may do well in the future. *Id.* at 22 (quoting the trial court as stating, "We do not find that Mother cannot or will not remedy the remaining conditions, particularly pertaining to addressing her mental health needs, within a reasonable period of time. . . . In other words, with a few more months of steady progress, Mother **may** avoid losing parental rights to her [c]hildren permanently. [Trial Court] Opinion and Order, 2/10/20, at 27-28 (emphasis added [by the Superior Court]))." In this regard, the Superior Court observed that, unlike 23 Pa.C.S § 2511(a)(5), there is no element of 23 Pa.C.S § 2511(a)(8) that requires an agency to present evidence that a parent cannot remedy the underlying

conditions within a reasonable period of time or that continued services would not likely alleviate the conditions which led to a child's placement. "Hence," the Superior Court concluded, "the portion of the trial court's dedication to Mother's anticipated progress is not only entirely speculative, but also statutorily irrelevant to the § 2511(a)(8) analysis." *Id.* at 22.

At that point in its Memorandum, the Superior Court turned its attention to whether the Agency met the requirements of the third prong of Subsection 2511(a)(8), *i.e.*, whether the Agency proved that termination of Mother's parental rights would best serve the Children's needs and welfare. In concluding that the Agency met its burden under this prong, the court again relied in large part on Ms. Lorenzo-Hendershot's testimony. Specifically, the intermediate court noted that, according to Ms. Lorenzo-Hendershot: (1) Mother attended 80 out of 121 visits scheduled with the Children; (2) the Children looked to service givers instead of Mother to address their needs during visitation; (3) the Children are together and thriving in their pre-adoptive kinship care foster home and view their foster mother as their mother; (4) the Children do not talk about Mother; (5) terminating Mother's rights would not sever a necessary and beneficial relationship for the Children; and (6) termination would best serve the Children's needs and welfare. Memorandum at 23-24. For these reasons, the Superior Court held that the trial court abused its discretion by determining that the Agency failed to prove by clear and convincing evidence that termination was proper under 23 Pa.C.S. § 2511(a)(8). *Id.* at 24.

The Superior Court then examined whether the Agency met its burden with respect to 23 Pa.C.S. § 2511(b). After providing an overview of the law in this area, *id.* at 24-25, the intermediate court asserted that the record belied the trial court's conclusion that a meaningful bond exists between Mother and the Children and that the Agency presented

a dearth of evidence concerning the effect on the Children of severing of that bond. Building on the evidence it cited in support of its Subsection 2511(a)(8) analysis, the intermediate court highlighted that Ms. Lorenzo-Hendershot opined that: (1) "termination of parental rights in anticipation of adoption supports the developmental, physical, and emotional needs and welfare of [the Children]," *id.* at 25; (2) the Children have a strong bond with their foster mother, who meets all of the Children's needs; and (3) terminating Mother's parental rights would not sever a necessary and beneficial relationship for the Children, *id.* at 25-26. Indeed, the Superior Court concluded that Ms. Lorenzo-Hendershot's testimony established by clear and convincing evidence all of the elements of Subsection 2511(b). *Id.* at 26. For these reasons, the Superior Court reversed the trial court's order and remanded the matter to the trial court, instructing that court to enter an order within 30 days terminating the parental rights of Mother. *Id.* at 33-34.

## V. Allowance of appeal to this Court.

Mother filed a petition for allowance of appeal, which this Court granted, limited to the following issues, as framed by Mother:

> (1) Whether the Superior Court erred in rejecting the trial court's findings under 2511(a)(8) and 2511(b), thereby conflicting with this Honorable Supreme Court's holding in *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179 (Pa. 2010).
>
> (2) Whether the Superior Court in the instant case has substituted its own discretion for that of the trial court, thereby substantially departing from an accepted and usual course of judicial proceedings.

*Interest of S.K.L.R.*, 249 A.3d 247 (Pa. 2021).

## VI. Issue 1.

## A. This Court's decision in *In re R.J.T.*

To understand the nature of this issue and the parties' related arguments, it is helpful for us to provide a summary of this Court's decision in *In re R.J.T.*, *supra*. A trial court adjudicated R.J.T. dependent due to, *inter alia*, domestic violence concerns

between his parents; he was placed in a foster home. *R.J.T.*, 9 A.3d at 1181. After several permanency review hearings, and two years after R.J.T.'s placement, the trial court held another permanency review hearing. At that hearing, the evidence was mixed as to the parents' progress toward meeting the goals that they needed to achieve to reunify with R.J.T. *Id.* at 1183 (explaining that "[t]estimony revealed that [R.J.T.'s parents] had made some progress toward addressing their domestic violence and drug and alcohol problems, as well as their other goals. [Allegheny County Office of Children, Youth, and Families ("CYF")], however, emphasized that [the parents] had not attained all the goals at the time of the hearing . . .").

At this hearing, over the parents' objection, CYF made an oral motion for a permanency plan goal change from reunification of R.J.T. with his parents to adoption. *Id.* Although the trial court acknowledged that the case presented a "close call," it ultimately denied CYF's motion. In its opinion in support of its decision, the court explicitly noted the significant obstacles that the family faced to achieve reunification. However, the court "determined, based on the facts at the time of the hearing, that reunification [was] best suited to [R.J.T.'s] safety, protection and physical, mental, and emotional welfare and adoption [was] not best suited for several reasons." *Id.* at 1184 (citation and internal quotation marks omitted).

The "several reasons" that the trial court cited to bolster its decision included: (1) the parents' adamant efforts to regain custody of R.J.T. by working toward the service plan goals; (2) the father's attendance at anger management and parenting classes; (3) the fact that the parents completed at least some of their mandated behavioral health sessions; and (4) the mother's securing of housing and a full-time job. *Id.* CYF appealed to the Superior Court, which reversed the trial court's order and remanded for entry of an order changing R.J.T.'s goal to adoption. *Id.*

In support of its decision, the Superior Court, *inter alia*, discussed record testimony that emphasized that the parents had not met all of their goals and that problems remained between them. Importantly, the trial court did not rely upon this evidence in reaching its conclusion. *Id.* at 1188. Indeed, "[d]espite quoting the trial court's statement during the hearing that the case involved a 'very close call,' the Superior Court found that the trial court abused its discretion in not granting the goal change to adoption." *Id.*

R.J.T.'s mother filed a petition for allowance of appeal, which this Court granted to consider "[w]hether the Superior Court erred in determining the trial court abused its discretion in denying CYF's permanency goal change request from reunification to adoption." *Id.* at 1188-89. We ultimately reinstated the trial court's order, concluding that the Superior Court erred by finding that the trial court abused its discretion when it denied CYF's motion to change R.J.T.'s goal to adoption.

We began our substantive analysis by observing that the standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion." *Id.* at 1190. It is our discussion and application of this standard of review that is at issue in the instant matter.

This Court in *R.J.T.* had no "quarrel with the trial court's observation that this case is a very close call." *Id.* In fact, we observed that the record could have supported a goal change to adoption, as R.J.T. had been in CYF custody for an extended period and his parents had not attained their goals at the time of the permanency review hearing. We, however, highlighted that the record also supported the trial court's decision to deny a goal change. With these circumstances in mind and most relevant to the instant matter, we explained as follows:

This case epitomizes why appellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. The Superior Court in this case did just that in highlighting negative information regarding [R.J.T.'s parents]. Moreover, the Superior Court did not conclude that the trial court's findings of fact were not supported by the record. Accordingly, we conclude that the Superior Court erred in reevaluating the evidence.

*Id.*

## B. The parties' arguments.

### 1. Mother's arguments.

Mother concedes that *R.J.T.* differs from the instant matter insomuch as the issue in *R.J.T.* involved a goal change in a dependency proceeding, whereas this case concerns the termination of a parent's rights to her children. Mother nonetheless suggests that the primary principle discussed in *R.J.T.* is applicable to termination proceedings. More specifically, Mother observes that, in *R.J.T.*, this Court explained that an appellate court is not in a position to make close calls in child dependency cases based on fact-specific determinations. Indeed, Mother notes, in *R.J.T.*, the Court explicitly stated, "Even if an appellate court would have made a different conclusion based upon the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." *R.J.T.*, 9 A.3d at 1190.

In further support of her position, Mother emphasizes that there is no language in *R.J.T.* limiting its application to goal change cases. Along these lines, Mother points out that we cited to and positively discussed *R.J.T.* in *In re Adoption of S.P.*, 47 A.3d 817 (Pa.

2012), a case involving the termination of parental rights, not a goal change. Mother dedicates the remainder of her argument regarding this issue to contending that the Superior Court violated the fundamental principle announced in *R.J.T.*, *i.e.*, an appellate court should not alter close calls made by a trial court in a highly factual child welfare proceeding.[8]

### 2. The Agency's arguments.

The Agency adopts the position that *R.J.T.* does not control this matter, as it is materially dissimilar to the instant case in several ways. The Agency begins with the obvious: *R.J.T.* was a goal change proceeding, whereas this case concerns the termination of parental rights. Later in its brief, the Agency explains that, inapposite to a goal change proceeding, which does not result in a permanent or preventative result, termination hearings require trial courts to make lasting, potentially harmful decisions regarding the fate of children.

Next, the Agency posits that, in addition to discussing the role of an appellate court in goal change proceedings, the Court in *R.J.T.* clearly held that the Superior Court in that matter misinterpreted the pertinent law. Here, the Commonwealth argues, the Superior Court made no such mistake. In fact, according to the Agency, the Superior Court correctly concluded that the trial court made several errors of law.

For example, the Agency submits that the trial court erred as a matter of law because it based its denial of the termination petitions, in part, on Mother's demonstrated ability to care for Younger Daughter. The Agency insists that the Superior Court properly relied on the court's previous decision in *In re A.L.D., supra,* when it stated, "It is beyond peradventure that evidence concerning a parent's ability to care for another child is

---

[8] Mother then details the portions of the record that support the trial court's order denying the Agency's petitions to terminate her parental rights. At this point, we need not discuss this aspect of her argument, as it is closely related to the second issue in this matter.

irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." Memorandum at 19. The Agency further notes that, unlike the circumstances presented in *R.J.T.*, the Superior Court in the matter *sub judice* clearly found that the record did not support several of the trial court's factual findings.

**C. Analysis.**

This Court has not specifically addressed whether the general principles of appellate review announced in *R.J.T.* should be applied to termination proceedings. Thus, we first must answer this threshold question.[9] Without hesitancy, we hold that the general principles of appellate review discussed in the goal change context in *R.J.T.* should be employed with equal force to the review of trial court termination decisions. In support of this conclusion, we highlight that the standard of review is exactly the same in goal change and termination proceedings. In both types of cases, an appellate court should: (1) review a trial court's order for an abuse of discretion; and (2) accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *See*, *e.g.*, *In re Adoption of S.P.*, 47 A.3d at 826 (explaining that "appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record").

Just as in the dependency setting, this abuse-of-discretion standard of review is crucial in termination proceedings, as appellate courts "are not in a position to make the close calls based on fact-specific determinations." *R.J.T.*, 9 A.3d at 1190. Indeed, the role of trial courts in termination proceedings shares many similarities to the part that they

---

[9] This query presents a question of law. "Like all questions of law, our standard of review is *de novo*, and our scope of review is plenary." *Skotnicki v. Ins. Dep't*, 175 A.3d 239, 247 (Pa. 2017).

play in goal change matters: (1) "Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved[;]" (2) appellate courts, therefore, should defer to "the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan[;]" and (3) "[e]ven if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id.*

When a trial court makes a "close call" in a fact-intensive case involving a goal change or the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court. We, therefore, must examine whether the Superior Court in the instant matter violated these principles, which we will do within the context of Mother's second issue questioning whether the Superior Court substituted its judgment for that of the trial court.

However, before we reach that issue, we take this opportunity respectfully to reject the Superior Court's adoption, and the Agency's promotion, of a *per se* rule that "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." Memorandum at 19 (quoting *In re A.L.D.*, 797 A.2d 326, 338 (Pa. Super. 2002)). As an initial matter, to preserve a claim that evidence was admitted in error, the offended party must timely object to the admissibility of the evidence and state a specific ground for the objection. Pa.R.E. 103(a)(1)(A) and (B). Here, the Agency waived any challenge to the admissibility

of the testimony that Mother ably parents Younger Daughter, as it failed to object to this evidence on any basis.

More importantly, there simply is no support in the law for the proposition that this type of evidence is irrelevant and inadmissible as a matter of the law. The well-settled test for relevancy states that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Relevant evidence is admissible, unless, for example, its probative value is outweighed by unfair prejudice. Pa.R.E. 402 and 403. There is nothing inherent about testimony in a termination case that a parent is competently caring for another child that would render that evidence *per se* irrelevant and inadmissible. Rather, trial courts in termination cases should utilize the established relevancy test on a case-by-case basis when asked to assess the admissibility of evidence related to a parent's ability to care for a child other than the child who is subject to the termination proceeding. If the trial court deems the evidence to be relevant, then the evidence should be admitted into the record and the court, as fact-finder, should assign that evidence the appropriate weight to which it is entitled in reaching its factual and legal conclusions.

## VII. Issue 2.

**A. The parties' arguments.**[10]

### 1. Mother's arguments.

In support of her position that the Superior Court substituted its judgment for that of the trial court, Mother highlights the various factual findings that the trial court made which weighed in favor of denying the termination petitions. In this regard, Mother notes

---

[10] The parties zealously argue over myriad factual findings of both the trial court and Superior Court. Our summary of their arguments is intended to highlight just a few of their contentions.

that the trial court found that she successfully completed anger management and parenting classes, secured employment, and obtained stable housing. In Mother's view, the record supports the trial court's conclusion that she has utilized the skills that she learned in her various classes. Mother concedes that she did not satisfy her mental health treatment goals, but she points out that the record also supports the trial court's conclusions that, at various times, she did participate in mental health treatment and she missed some treatment while fulfilling her goal to sustain gainful employment.

Mother submits that these findings alone are sufficient to support the trial court's decision to deny the termination petitions. She contends that, by refusing to substantiate these findings and instead searching the record for a contrary conclusion, the Superior Court violated the principles discussed in *R.J.T.* by failing to apply the abuse-of-discretion standard of review and substituting its judgment for that of the trial court. Yet, as Mother observes, the Superior Court was in no position to reassess the case on a cold record.

Building on this premise, Mother further insists that the record supports the trial court's conclusions concerning her positive interactions with the Children during supervised visits. For example, ample hearing testimony established, *inter alia*, that the Children greet Mother with hugs and kisses and that she engages with the Children, appropriately disciplines them, and comforts them when they become upset while leaving from visits. In addition, Mother suggests that, to the extent that the trial court credited her testimony over that of Agency Caseworker, Ms. Oddis, the decision was warranted given the few visits that Ms. Oddis had with the family. Indeed, Mother submits that the Agency's evidence carried little weight in total given the dearth of direct observation of the family by the Agency's various witnesses.

Mother also shares her view that the trial court's conclusions regarding the Children's best interests are supported by the record. In this regard, Mother believes that

the trial court appropriately determined that the Children have a strong bond with her and that severing that bond could cause harm to the Children. Mother submits that, had the three Superior Court judges been the trial court judge in this case, they may have reasonably reached the conclusion that termination was appropriate. However, Mother maintains that, because the Superior Court was acting as a reviewing court, it erred by substituting its judgment for that of the trial court and overlooking that the trial court implicitly resolved a number of testimonial conflicts in her favor.

### 2. The Agency's arguments.

The thrust of the Agency's argument is that the Superior Court correctly concluded that the Agency proved by clear and convincing evidence that the requirements set forth in 23 Pa.C.S. §§ 2511(a)(8) and 2511(b) were met and that, therefore, termination of Mother's parental rights was appropriate. In particular, the Agency advocates that the Superior Court correctly concluded that: (1) the Children had been in the Agency's custody for 25 months; (2) the conditions that led to the Children's removal, most notably Mother's mental health problems, continued to exist; and (3) termination of Mother's parental rights best serves the needs and welfare of the Children.

The Agency further agrees with the Superior Court's assessment that termination of Mother's parental rights will not sever a necessary and beneficial relationship for the Children. In support of its position, the Agency refers to the hearing testimony of Ms. Lorenzo-Hendershot, which we detailed *supra*. The Agency notes that, in finding that the Children have a meaningful bond with Mother, the trial court relied solely on Mother's testimony, which conflicted with Ms. Lorenzo-Hendershot's testimony. According to the Agency, the trial court neglected to resolve this, and other, conflicts in testimony.

The Agency also builds on its stance that the Superior Court appropriately determined that the trial court erred as a matter of law on several occasions. For example,

the Agency contends that the trial court made clear that it considered Mother's post-termination petition conduct in denying the Agency's termination petitions. Trial Court Opinion, 2/10/2020, at 27. However, the Agency argues, because consideration of this conduct is prohibited, the Superior Court correctly concluded that the trial court erred in this regard. Agency's Brief at 19-20 (citing 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.")).

In addition, the Agency reminds the Court that permanency is the ultimate goal for the Children and that they have been in a stable kinship foster care home for nearly two years. Although the Agency concedes that a future termination proceeding could occur, it urges this Court to affirm the Superior Court's judgment, as all of the statutory requirements have been met and the Children should not linger in placement on the speculative hope that Mother can one day care for them.

In sum, the Agency avers that the Superior Court acted within its standard of review by reversing the trial court. The Agency explains that, because the trial court made legal errors and factual findings that were not supported by the record, the Superior Court properly concluded that the trial court's order could not withstand appellate scrutiny. The Agency firmly rejects the notion that this matter constituted a "close case" and contends that the Superior Court in no way substituted its judgment for that of the trial court.

**B. Analysis.**

On multiple occasions, this Court has acknowledged that parents enjoy a fundamental constitutional right to raise their children as they deem fit. *See, e.g., Hiller v. Fausey*, 904 A.2d 875, 883 (Pa. 2006) (explaining that the United States Supreme Court has "recognized the existence of a constitutionally protected right of parents to

make decisions concerning the care, custody, and control of their children") (referring primarily to the United States Supreme Court's decision in *Troxel v. Granville,* 530 U.S. 57 (2000)). The involuntary termination of a parent's rights to a child obviously constitutes a state's most extreme and permanent measure of interfering with that right. Consequently, and as previously noted, any party seeking this remedy must prove by clear and convincing evidence that termination of a parent's rights is warranted pursuant to 23 Pa.C.S. § 2511.[11] *In re T.S.M.,* 71 A.3d 251, 267 (Pa. 2013).

As noted throughout this opinion, appellate review of an order granting or denying a petition to terminate involuntarily a person's parental rights is limited. An appellate court is required to accept a trial court's finding of facts and credibility determinations if they are supported by the record. *Id.* at 267. If the trial court's factual conclusions are supported by the record, then the appellate court can examine whether the trial court abused its discretion in entering its order. *Id.* Concerning the central principles at issue here, a trial court's order "may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* (citation and internal quotation marks omitted). Importantly, an appellate court should not reverse a trial court's order merely because the record would support a result contrary to that reached by the trial court. *Id.* Further, and perhaps most significant to the instant matter, this Court has repeatedly "emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *Id.* (citing *R.J.T.*, 9 A.3d at 1190).

The Agency sought to terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(5) and (8). Both of these provisions require the party seeking termination to prove that "the conditions which led to the removal or placement of the child continue to

---

[11] "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

exist." Here, several conditions prompted the Agency to remove the Children from Mother's custody: (1) the potential abuse of Younger Son; (2) Mother's struggles with parenting and disciplining the Children; (3) Mother's mental health issues; (4) Mother's difficulty managing her anger; (5) T.H. abusing Mother; (6) housing concerns; and (7) Mother's inability to sustain gainful employment.

To reunify with the Children, Mother was tasked with meeting a laundry list of goals that even the most competent and dedicated of parents would struggle to accomplish. Mother was required to complete the following: (1) mental health treatment; (2) parenting instruction; (3) life skills classes; (4) anger management counseling; (5) obtain stable housing; (5) secure employment; and (6) address domestic violence and abuse issues. After observing all of the witnesses testify at the termination hearing, the trial court concluded that "many of the conditions which led to [the Children's] removal no longer exist[.]" Trial Court Opinion, 2/10/2020, at 23.

As we discussed above, the trial court was persuaded that, since the Children have been removed from Mother's care, she has: (1) participated in mental health treatment; (2) completed parenting instruction and anger management classes; (3) lived with her mother, grandmother, and Younger Daughter while beginning to search for independent housing; (4) secured gainful employment; (5) gathered insight into how to parent the Children; and (6) demonstrated that she has been able to incorporate some of her learned skills during visitations with the Children, *e.g.*, she cooks for them, disciplines them, and plays with them. *Id.* at 23-24. According to the court, "[b]ut for the fact that Mother has not attended therapy sessions recently with a mental health professional because her work schedule allows her little time, none of the conditions that led to the removal and placement of the children continue to exist." *Id.* at 24.

In reversing the trial court, the Superior Court focused almost exclusively on Mother's inability to rid herself of mental health problems in concluding that the conditions that led to the Children's removal continue to exist.[12] Memorandum at 20 ("Furthermore, the conditions which led to removal, Mother's mental health problems, still exist."). The Superior Court was mistaken in this regard. Indeed, utilizing the proper standard of review, we conclude that the record supports the trial court's finding that the conditions that led to the removal of the Children no longer exist.

Unlike the Superior Court, the trial court correctly identified that several conditions, not just Mother's mental health issues, led to the removal of the Children from Mother's custody. Trial Court Opinion, 2/10/2020, at 23-24. Further, evidence of record fully supports the trial court's conclusion that Mother successfully addressed these conditions. It is undisputed that Mother completed anger management and parenting classes and that, at least to some significant degree, she has been able to translate those learned skills to parenting the Children. For example, as noted above, Ms. Oddis testified that Mother rarely, if ever, yells at the Children and, instead, appropriately disciplines them when they misbehave. N.T., 1/16/2020, at 18-19.

It also is indisputable that, at the time of the termination hearing, Mother obtained gainful employment and stable housing. In addition, the record supports the trial court's determination that Mother adequately addressed issues of domestic violence and abuse by severing her relationship with T.H. For instance, Ms. Lorenzo-Hendershot testified that T.H. no longer has any involvement with Mother, *id.* at 91, and Mother's testimony confirmed this fact, *id.* at 143.

---

[12] The Agency's position suffers from a similarly narrow focus. *See, e.g.,* Agency's Brief at 19 ("The conditions that led to Children's removal, most notably Mother's mental health concerns, continued to exist.").

Regarding Mother's mental health status, it is true that she did not complete her treatment goals or fully recover from her mental health challenges. However, as we documented above, the record undeniably supports the trial court's conclusion that Mother participated in some mental health treatment. In addition, the trial court's opinion makes clear that the court implicitly credited Mother's testimony that her inability to complete or engage fully in her mental health treatment was due in part to her current full-time employment and schedule related thereto. If, as the Agency currently advances, Mother's mental health treatment was the principle condition precedent in reuniting the Children with her, then Mother's goals should have been pared down and prioritized to allow her to focus on and accomplish that goal.[13]

Before summarizing our conclusion, we pause to address the Agency's contentions regarding the role that concurrent planning has played in this family's experience. "[C]oncurrent planning 'is a dual-track system under which child welfare service agencies provide services to parents to enable their reunification with their children, while also planning for alternative permanent placement should reunification fail.'" *In re R.J.T.,* 9 A.3d at 1183 (quoting *In re Adoption of S.E.G.,* 901 A.2d 1017, 1019 (Pa. 2006)).

According to the Agency, it chose not to pursue a goal change from reunification with Mother to adoption in this case, electing instead to utilize concurrent planning. Agency's Brief at 14. The Agency submits that, by choosing this course, it was able to offer the family reunification services and allow the Children's primary goal to remain reunification. *Id.* However, the Agency further asserts that, "[u]nder concurrent planning,

---

[13] Indeed, the record strongly suggests that Mother may have met her mental health goals had she sacrificed her employment. We find it irreconcilable that the Agency demanded Mother's attendance at her employment and mental health treatment, when the time for completing these tasks occurred simultaneously.

an [a]gency is not then required to pursue reunification only and further delay a child's permanency outcome." *Id.* at 16.

In our respectful view, the Agency's actions failed to adhere to the fundamental tenets of concurrent planning by unilaterally cutting in half Mother's contact with the Children when it decided to file petitions to terminate Mother's parental rights. As the trial court adeptly observed, the Agency simply "presumed that termination would be granted and began to withdraw services aimed toward reunification of the family unit." Trial Court Opinion, 2/10/2020, at 26. When a child's goal is reunification with his or her parent, unless and until a trial court finds merit to a termination petition, concurrent planning requires that an agency continue to provide appropriate reunification services to the family while pursuing potential termination of parental rights. Otherwise, as here, the agency risks that the trial court will deny the termination petition, causing the decrease in services to impede further a parent's chances of regaining custody of his or her child and, importantly, failing to serve a child welfare agency's core mission of protecting children's best interests.

## VIII. Conclusion.

Termination of parental rights is among the most powerful legal remedies that the judicial system possesses. The decision to sever permanently a parent's relationship with a child is often bound up in complex factual scenarios involving difficult family dynamics and multiple service providers. Our trial courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act.

Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

In the instant matter, we respectfully conclude that the Superior Court exceeded its standard of review. Rather than examining the record to determine whether it supports the trial court's conclusion that the various conditions that led to the Children's removal from Mother's custody no longer continue to exist, the intermediate court focused exclusively on one condition that led to the Children's removal, *i.e.,* Mother's mental health issues, and searched the record to support its view that Mother has failed to address this condition adequately. Because the Superior Court erred by substituting its judgment for that of the trial court, we vacate the Superior Court's judgment and reinstate the trial court's order.

Justices Saylor, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.